

# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

### CENTRAL DIVISION

*********************************************************************************************

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. 14-30067-RAL |
| Plaintiff, | |
| -vs- | REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS EVIDENCE AND STATEMENTS |
| LAWRENCE BORDEAUX, | |
| Defendant. | |

*********************************************************************************************

## SUMMARY

Lawrence Bordeaux was stopped for failing to dim his headlights. He did not have a driver's license and police officers suspected that he was under the influence of something. Following successive alerts from a drug dog, Bordeaux and his vehicle were searched and he was questioned. He now seeks to suppress all of the evidence seized from him and the vehicle as well as his statements on Fourth Amendment and *Miranda* grounds. Because federal law does not require the exclusion of this evidence or of Bordeaux's statements to law enforcement, the Court recommends that his suppression motion be denied.

## BACKGROUND

On March 12, 2014, at approximately 3:48 a.m., Rosebud Tribal Police Officers Darrin Running Horse and Patrick Iyotte were on patrol in the Rosebud community. They were

traveling southbound on BIA 1 when they observed a white Oldsmobile Alero approaching them in the northbound lane with its headlights on high beam. The vehicle passed the officers with its bright lights still on. In response, Officer Running Horse activated the patrol car's emergency lights and initiated a traffic stop. Just before doing so, the officers noticed that the vehicle dimmed its headlights.

After the vehicle pulled over, Officer Running Horse made contact with the driver, who did not produce a driver's license, but identified himself as Bordeaux. Officer Running Horse advised Bordeaux of the reason for the stop. Bordeaux replied that he was "going after his brother." The officer then inquired about the ownership of the vehicle and Bordeaux said that his girlfriend had bought it from Darrylynn Whipple.

While talking to Bordeaux, Officer Running Horse noticed that his eyes were red, bloodshot and glossy, his voice and hands appeared to be shaky, he was nervous and he avoided eye contact. Bordeaux said he had just woken up. Given the hour involved (an "active" time for impaired drivers to be on the road), the officers thought they might possibly have a DUI on their hands.

Officer Running Horse returned to the patrol car and checked with his dispatcher on Bordeaux's driver's license status and for active warrants. Dispatch informed the officer that Bordeaux had no driver's license or outstanding warrants.

Officer Running Horse walked back to the vehicle and asked Bordeaux to step to the rear of it. Bordeaux complied and was asked if he had been drinking that night. When he said no, the officer asked him to submit to a portable breath test, which Bordeaux agreed

2

to do. The test was administered and registered .000. This test result prompted the officer

to suspect that Bordeaux was perhaps under the influence of something other than alcohol.

So Officer Running Horse deployed his police service dog, "Cruz", who was on

scene and in the patrol car, for an exterior sniff of Bordeaux's vehicle. Cruz sniffed the

open window on the driver's side and immediately stopped and stood still. Bordeaux then

went back and showed Cruz the window area again and Cruz alerted by freezing a second

time.

Following the alerts, and once Cruz had been placed back in the patrol car, Officer

Running Horse advised Bordeaux that the vehicle was going to be searched. Upon

learning that Cruz had alerted, Officer Iyotte conducted a search of Bordeaux's person.

During the search, Officer Iyotte found lighters in each of Bordeaux's front pants pockets

and a checkbook in his rear pants pocket. The officer opened the checkbook and

discovered that there were three rolls of currency in it. The officer asked Bordeaux if he

was employed and Bordeaux stated that he did part-time contracting work with SWA and

that he last worked approximately two weeks earlier. The officer then asked Bordeaux

how much money was in the checkbook and Bordeaux said there was approximately $1,200

that he had been saving for his daughter's birthday. Bordeaux was then put in the backseat

of the patrol car.

While searching the interior of the vehicle, the officers found a half burnt rolled

cigarette containing suspected marijuana and a digital scale. The officers returned to the

patrol car and inquired of Bordeaux whether he had anything on his person. Bordeaux

3

denied that he did and the officers searched him a second time. They observed a bulge in his waist band area – something Officer Iyotte maintained was not present during the first search – that Officer Running Horse attempted to check on. As Officer Running Horse did this, Bordeaux pulled or turned away. Believing that Bordeaux was trying to hide something, Officer Running Horse asked Bordeaux what the bulge was. Bordeaux indicated that he was a diabetic and that the bulge was a bag with a tube attached to his middle part that he used to urinate. He also said that he was in pain and had to go to the bathroom. Officer Running Horse asked him if he needed medical attention, but he said no. Concerned about Bordeaux's well being, Officer Running Horse called for an ambulance nonetheless and placed Bordeaux back in the rear seat of the patrol car.

A short time later, the ambulance arrived and the EMTs spoke to Bordeaux. In the meantime, Officer Iyotte noticed a black cord hanging from Bordeaux's waist band and asked Bordeaux what it was. With Bordeaux's consent, the officer removed the cord and a nylon bag came out with it. The bag was opened, but nothing was found inside. The officer asked what the bag was for and Bordeaux said it was for his insulin shots. The officer inquired where the syringes were, but Bordeaux said he did not know.

Bordeaux was subsequently taken back to the patrol car, secured in the backseat, and transported to the Rosebud Jail. He had been placed under arrest after the marijuana and scale had been found in the vehicle, but was being held at the scene because of his complaints of pain and his diabetic condition until medical personnel saw and cleared him.

Before being booked in, Officer Running Horse read Bordeaux the implied consent and requested a urine sample. Bordeaux declined to provide one.

Thereafter, three baggies were retrieved from Bordeaux's underwear and crotch area. The baggies were tested and found to contain methamphetamine.

Special Agent Ben Estes was called in to assist with the investigation. Agent Estes spoke with Bordeaux shortly after 10:00 a.m. that same morning. During the interview, Bordeaux made incriminating statements.

On June 10, 2014, Bordeaux was charged, in a federal indictment, with conspiracy to distribute and possession with intent to distribute a controlled substance (methamphetamine) in violation of 21 U.S.C. §§841(a)(1), 841(b)(c) and 846. He thereafter filed a motion to suppress the evidence seized from him and the vehicle and the statements he made to tribal officers on March 12, 2014. He claims that the stop was without the necessary reasonable suspicion and that his detention, the search of the vehicle, his arrest and the search of him – at the jail – all violated his Fourth Amendment rights and require suppression. He also claims that his statements should be excluded because they (1) were obtained without any *Miranda* advisements and (2) were the fruit of an illegal stop, search and arrest. Finally, he challenges the reliability of the drug detection dog, Cruz, and requests that dog's training and certification records be produced.

5

## DISCUSSION

### A. Stop

Bordeaux initially complains that his traffic stop, for a high headlight beam violation, was without reasonable suspicion or probable cause and contravened the Fourth Amendment. He says that there was no law violation to justify the stop and all of the evidence that was obtained following it is inadmissible under the "fruit of the poisonous tree" doctrine.[1]

Officers have "probable cause to conduct a traffic stop when [they] observe[ ] a minor traffic violation."[2] They may do so even if the stop is a pretext for other investigation.[3] The constitutional reasonableness of the stop does not depend on the actual motivations of officers and their subjective intentions for making one are irrelevant in determining the validity of it.[4]

_____

[1] See Wong Sun v. United States, 371 U.S. 471 (1963).

[2] United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007); United States v. Martin, 411 F.3d at 998, 1001 (8th Cir. 2005); United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004), cert. denied, 544 U.S. 990 (2005).

[3] See United States v. Coney, 456 F.3d 850, 855-56 (8th Cir. 2006); see also Whren v. United States, 517 U.S. 806, 810-813 (1996) (a valid traffic stop may not be challenged on the ground that it was a pretext for other investigation).

[4] See Whren, 517 U.S. at 813; United States v. Herrera-Gonzales, 474 F.3d 1105, 1107 (8th Cir. 2007); Martin, 411 F.3d at 1001; see also United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (a traffic stop is "invalid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot"); United States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006) (per curiam) ([T]he [F]ourth [A]mendment is not violated if an objectively good reason for a traffic stop exists, whatever the actual subjective motive of the officer making the stop may have been.").

The failure of a vehicle to dim its headlights when meeting and passing another vehicle – a violation of state and tribal law[5] – is itself enough reason to make a traffic stop.[6] This is true notwithstanding whether the patrolling officers would have ordinarily stopped the vehicle for not tilting its headlights downward.[7]

The reason for the traffic stop in this case – not dimming the vehicle's headlamp beams as prescribed – was both legitimate under the circumstances and constitutionally permissible. Meeting and driving past another vehicle with bright lights on provided a sanctioned basis for stopping Bordeaux, even if Officers Running Horse and Iyotte had in mind something other than the enforcement of this equipment violation.[8] And based on the video evidence, the officers had an objectively reasonable basis to believe that he did not reduce his headlight intensity when he approached and passed them on the highway.[9]

---

[5] See SDCL 32-17-7 (circumstances under which headlamps must be dimmed); Rosebud Sioux Tribe Law and Order Code §6-5-1 (incorporating into the Tribal Traffic Code the South Dakota motor vehicle and traffic laws including SDCL 32-17-7).

[6] See Green v. Throckmorton, 681 F.3d 853, 860 (6th Cir. 2012); United States v. Bustillos-Munoz, 235 F.3d 505, 512-13 (10th Cir. 2000), cert. denied, 534 U.S. 854 (2001); United States v. Menard, 95 F.3d 9, 10 (8th Cir. 1996); United States v. Escarceja, No. 06-10018-JTM, 2006 WL 2663127 at **2-3 (D. Kan. Sept. 15, 2006); see also State v. Wright, 2010 S.D. 91, ¶14, n.1, 791 N.W.2d 791, 796, n. 1 (SDCL 32-17-7 requires a motorist to dim his headlights when he meets oncoming traffic and can provide probable cause to stop a vehicle).

[7] See id.; Sallis, 507 F.3d at 649-50, United States v. Williams, 429 F.3d 767, 771-72 (8th Cir. 2005).

[8] See Whren, 517 U.S. at 812-13; United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004).

[9] See United States v. Hastings, 685 F.3d 724, 727-28 (8th Cir. 2012), cert. denied, 133 (continued...)

The stop was supported by probable cause[10] and comported with the dictates of the Fourth Amendment.[11]

## B. Detention

Bordeaux next argues that he was unjustifiably detained, for a prolonged period of time, to permit a canine sniff. He maintains that there was no basis for detaining him and deploying Cruz.

Where a vehicle has been properly stopped for a traffic related offense, the use of a drug dog to sniff around the exterior of the vehicle for contraband does not violate the Fourth Amendment – even in the absence of any articulable facts to suggest drug activity.[12] And the dog's alert provides probable cause to search the vehicle including its trunk.[13] Thus, if the motorist was lawfully seized when the drug sniff occurred, there can be no

---

[9](...continued)
S.Ct. 958 (2013); *Martin*, 411 F.3d at 1001; *United States v. Smart*, 393 F.3d 767, 770 (8th Cir.), *cert. denied*, 545 U.S. 1121 (2005); *United States v. Valandra*, CR. 11-30010-RAL, 2011 WL 3439919 at *12 (D.S.D. Aug. 5, 2011).

[10]*See Sallis*, 507 F.3d at 649; *Coney*, 456 F.3d at 855-56; *Valandra*, 2011 WL 3439919 at **11-12.

[11]*See Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (*per curiam*); *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008).

[12]*See Illinois v. Caballes*, 543 U.S. 405, 407-10 (2005); *United States v. Rodriguez*, 741 F.3d 905, 907 (8th Cir.), *petition for cert. filed*, (U.S. May 1, 2014) (No. 13-9972); *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009); *United States v. High Wolf*, CR. 07-30102-01-KES, 2008 WL 3833587 at *2 (D.S.D. Aug. 11, 2008).

[13]*See Rivera*, 570 F.3d at 1012; *United States v. Bloomfield*, 40 F.3d 910, 919 (8th Cir. 1994) (*en banc*), *cert. denied*, 514 U.S. 1113 (1995).

Fourth Amendment infringement.[14] Suppression is appropriate only when the seizure is "prolonged beyond the time reasonably required to complete" the stop,[15] and is "a but-for cause of obtaining the evidence."[16] A brief delay to employ the dog does not unreasonably prolong the stop, however, and the Eighth Circuit has repeatedly upheld dog sniffs that took place minutes after the stop concluded.[17]

In this case, approximately five minutes elapsed between the initial traffic stop and Cruz's deployment. Officers were entitled to detain Bordeaux for a few minutes to complete a number of routine tasks related to the stop and traffic violation.[18] Keeping him another one to two minutes, before conducting a canine sniff, was not an unreasonable enlargement of the stop and amounted to nothing more than a *de minimis* intrusion on his personal liberty.[19]

---

[14]See *Rivera*, 570 F.3d at 1012-13.

[15]See *Caballes*, 543 U.S. at 407.

[16]See *Peralez*, 526 F.3d at 1121 (citations omitted).

[17]See e.g. *Rodriguez*, 741 F.3d at 907 (seven- or eight-minute delay); *United States v. Mohamad*, 600 F.3d 1000, 1005 (8th Cir. 2010) (five minutes); *United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir. 2006) (four minutes), *cert. denied*, 549 U.S. 1118 (2007); *Martin*, 411 F.3d at 1002 (two minutes); *United States v. Morgan*, 270 F.3d 625, 632 (8th Cir. 2001) ("well under 10 minutes" upheld), *cert. denied*, 537 U.S. 849 (2002); *$404,905.00 in U.S. Currency*, 182 F.3d 643, 649 (8th Cir. 1999) (two minutes), *cert. denied*, 528 U.S. 1161 (2000).

[18]See *United States v. Salgado*, No. 13-2480, 2014 WL 3746885 at *3 (8th Cir. July 31, 2014 (citing *Fuse*, 391 F.3d at 927); *Rivera*, 570 F.3d at 1013; *$404,905.00 in U.S. Currency*, 182 F.3d at 647.

[19]See *Rodriguez*, 741 F.3d at 907; *United States v. Coleman*, 700 F.3d 329, 335-36 (8th (continued...)

Although a traffic offender's detention may be momentarily extended, without reasonable suspicion, to allow for a canine sniff of his vehicle,[20] it is worth noting that the officers here had reason to believe that criminal activity, unrelated to the stop, was afoot. Bordeaux's desire to take an early morning drive – without a driver's license – after just waking up, his red, bloodshot and glossy eyes, his shaky voice and hands, his nervousness and his failure to maintain eye contact caused the officers to suspect that he was under the influence of alcohol. Consistent with their suspicions, the officers asked him if he had been drinking that night. He responded in the negative. Skeptical of this, the officers requested, and he agreed, to submit to a portable breath test. The results indicated that he had not consumed any alcohol.

Bordeaux though continued his nervous behavior, even after the PBT cleared him. Because of the negative test results, the officers suspected, based on what they saw, heard and knew, that he might instead be under the influence of drugs. To confirm or dispel these suspicions, Officer Running Horse retrieved Cruz, who alerted on the vehicle in less than a minute.

Under the totality of the circumstances then present, Officers Running Horse and Iyotte diligently pursued a means of investigation to quickly verify their reasonable

---

[19](...continued)
Cir. 2012), *cert. denied*, 133 S.Ct. 2369 (2013); *see also United States v. Bowman*, 660 F.3d 338, 343-44 (8th Cir. 2011) (14-minute stop was not unreasonable); *Rivera*, 570 F.3d at 1012-15 (extension of the seizure was *de minimis* and did not violate the Fourth Amendment); *Mohamad*, 600 F.3d at 1005 (canine sniff within five minutes of concluding lawful stop was *de minimis*).

[20]*See Mohamad*, 600 F.3d at 1005.

suspicions[21] that Bordeaux was in possession, or under the influence, of drugs. [22] The officers were well within their bounds in detaining Bordeaux, after a valid traffic stop, for a fleeting moment and using the drug dog they had on hand to sniff the outside of his vehicle. There was no prolonged seizure and consequently no constitutional transgression.

## C. Cruz's Reliability

Bordeaux attacks Cruz's reliability and challenges the search that was conducted pursuant to the dog's alert. As part of his challenge, Bordeaux requested that the Court order the production of Cruz's training and certification records. The Government disclosed records pertaining to Cruz's April, 2013 narcotics detection certification and July, 2014 recertification and his training records from May, 2013, through March, 2014. Bordeaux did not ask for any of Cruz's field performance records no doubt because they have "relatively limited import," "[e]rrors may abound in [them]," they "may markedly over-state" false positives and the "better measure[ ] of the dog's reliability comes away from the field, in controlled testing environments."[23]

---

[21]*See Bowman,* 660 F.3d at 343-44; *Mohamad,* 660 F.3d at 1005.

[22]*See Michigan v. Summers,* 452 U.S. 692, 701 n.14 (1981); *United States v. Poole,* CR. 13-3003-MWB, 2013 WL 3808243 at **7-8 (N.D. Iowa July 22, 2013).

[23]*Florida v. Harris,* 133 S.Ct. 1050, 1056-57 (2013); *see also Salgado,* 2014 WL 3746885 at *5 (no abuse of discretion in denying the defendant access to "minimally prohibitive field performance records" for the purpose of cross-examining the drug dog's handler).

Evidence of a drug-detection dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust the dog's alert.[24]   "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."[25]   The same is true, even when there has been no formal certification, if the dog has recently and successfully completed a training program that evaluated the dog's proficiency in locating drugs.[26]

Nevertheless, a defendant is entitled to challenge a drug dog's reliability, whether by cross-examining the testifying officer or by introducing fact or expert witnesses.[27] If the Government comes forward with proof, from controlled settings, that the dog performs reliably in detecting drugs and the defendant does not contest this showing, then probable cause should be found.[28]   But if the defendant challenges the reliability of the dog overall or of a particular alert, then the court should weigh the competing evidence and decide the probable cause issue like any other.[29] The overarching question – found in every probable cause inquiry – is whether the facts surrounding the dog's alert, when viewed through a

---

[24]*See Harris*, 133 S.Ct. at 1057.

[25]*Id.*

[26]*See id.*

[27]*See id.*

[28]*See id.* at 1058.

[29]*See id.*

common sense lens, would convince a reasonably prudent person that a search would reveal contraband or evidence of a crime.[30]  The dog's sniff, and resulting alert, is up to snuff when it satisfies this test.[31]

And here, Cruz's were.  His credentials and accomplishments in controlled testing environments gave Officers Running Horse and Iyotte the requisite probable cause to search Bordeaux's vehicle when Cruz alerted to the driver's side area of it.[32]

The Government introduced credible evidence of Cruz's training and proficiency in findings drugs.  Less than 11 months before alerting to the vehicle, Officer Running Horse and Cruz successfully completed a program in narcotics detection and obtained a certification from an independent canine training company that evaluates police service dogs.  Officer Running Horse also worked with Cruz, who had previously been certified in drug detection, each month on exercises designed to hone their skills.  Training records divulged show that Cruz always found secreted drugs and that he performed "satisfactorily" (the higher of two possible assessments) in his exercises.  And the testimony and documentary evidence presented confirmed that the dog functioned at a high level.

Bordeaux does not challenge Cruz's certification.  Rather, he questions the caliber of the dog's training by pointing out that just four hours a month were devoted to drug detection exercises and that only a segment of those exercises involved vehicles.  But Cruz

---

[30]*See id.*

[31]*See id.*

[32]*See id.* at 1059; *United States v. Holleman,* 743 F.3d 1152, 1156-58 (8th Cir.), *cert. denied,* 134 S.Ct. 2890 (2014).

demonstrated his narcotics detection acumen in testing and evaluations done by third

parties and was stellar at exposing controlled substances hidden in and outside of vehicles

and elsewhere. This record, when considered along with Cruz's training, certifications,

history and experience,[33] is more than adequate to establish the dog's reliability.[34]

## D. Cash Seized

Although Bordeaux moves generally to suppress all of the evidence seized following

the traffic stop, he does not specifically address the $1,200 in cash found on him after a pat

down search of his person was conducted at the scene. The Government concedes that

there are issues with respect to the removal of the checkbook, containing the money, from

his pocket and the opening of the same. But the Government asserts that even if the search

and seizure of the money along the roadside were unlawful, the money is admissible, and

does not have to be suppressed, based on the inevitable discovery doctrine.

Thirty years ago, the Supreme Court in *Nix v. Williams*[35] adopted the ultimate or

inevitable discovery exception to the exclusionary rule. Under this exception, information

---

[33]*See United States v. Valandra*, CR. 11-30010-RAL, 2011 WL 3439930 at **5-6 (D.S.D. June 9, 2011) (prior training and "real world" field records showed that Cruz's accuracy rate was 100% in training and between 71.4% and 78.6% in the field), *report and recommendation adopted*, 2011 WL 3439919 at *12; *see also Holleman*, 743 F.3d at 1157 (drug dog with "in-field" accuracy record of 57% was reliable); *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir.) (affirming the denial of a suppression motion despite the fact that the drug dog had an even lower 54% "in-field" accuracy rating), *cert. denied*, 551 U.S. 1123 (2007).

[34]*Harris*, 133 S.Ct. at 1057-59; *Holleman*, 743 F.3d at 1157-58; *Poole*, 2013 WL 3808243 at **9-10.

[35]467 U.S. 431 (1984).

discovered in violation of the Fourth Amendment need not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."[36] The rationale for the exception is to put the police in the same, but not a worse, position than they would have been in if no police error or misconduct had occurred.[37]

Since then, the Eighth Circuit has said that for the exception to apply, the Government must show (1) a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) an active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation.[38] Two judges of the Eighth Circuit have argued that the first prong of this test is over inclusive and dilutes the Supreme Court's standard.[39] The second prong of the test, they proclaim, is under inclusive and requires proof that contravenes *Nix's* commands and creates an inappropriate prophylactic rule that unduly expands the exclusionary rule.[40] They urged the full court to reconsider the circuit's previous standard and align itself with

---

[36]*Id.* at 444.

[37]*Id.* at 443 & n.4.

[38]*See United States v. Allen,* 713 F.3d 382, 387 (8th Cir. 2013) (*citing United States v. Conner,* 127 F.3d 663, 667 (8th Cir. 1997)).

[39]*See United States v. Thomas,* 524 F.3d 855, 861 (8th Cir. 2008) (Colloton and Benton, JJ., concurring).

[40]*See id.* at 862.

the majority of federal circuits.[41] A subsequent panel has applied part of the standard these judges proposed.[42]

Bordeaux was arrested for possession of marijuana after marijuana and a digital scale were found in the car he was driving. He was then searched a second time, and taken to jail. There, he would have been searched and his property inventoried, as a matter of policy and routine, during the booking process. The cash, that was earlier seized before the car was searched, would have ultimately and inevitably been discovered while he was being processed in advance of his incarceration. Whether the standard is one of "reasonable probability," "more likely than not" or something higher than either of these two,[43] it will suffice to say that the cash on Bordeaux's person was discovered by lawful means.[44]

The officers were engaged in a separate line of investigation at the time they found the checkbook and cash in Bordeaux's pocket. Cruz had just been deployed and the officers were going to search the vehicle based on the dog's alert. After finding contraband in the vehicle, they arrested Bordeaux and searched him again. He was then taken to jail, where he was searched a third time, his property was collected and inventoried, and he was interviewed. These facts are enough to demonstrate that there was a parallel and

---

[41]See id.; 6 Wayne R. LaFave, *Search and Seizure*, §11.4(a), n. 164 (5th ed. 2012).

[42]See *United States v. Johnson*, 528 F.3d 575, 580 (8th Cir. 2008).

[43]See *Thomas*, 524 F.3d at 861-62.

[44]See *Allen*, 713 F.3d at 387-88; *United States v. Almeida*, 748 F.3d 41, 49 (1st Cir. 2014).

mutually exclusive investigation in progress, or at the very least, a routine police procedure or practice being executed, that would have inevitably resulted in the discovery of the cash.[45]   Regardless of whether the Eighth Circuit's substantial, alternative line of investigation requirement or a more flexible one is applied in this case, there exists a sufficient basis for concluding that the $1,200 seized from Bordeaux "ultimately and inevitably" would have been discovered.[46] Hence, the money, even if obtained during an illegal roadside search and seizure, escapes the jaws of the exclusionary rule and is admissible at trial.

## E. Statements

Bordeaux also seeks to suppress the statements he made to (1) Officer Iyotte in response to being questioned about the $1,200 in cash that was found during the pat down search conducted next to the patrol car and (2) Special Agent Ben Estes, about five hours later, at the jail.  He claims that the statements cannot be used at trial against him because they were procured without any advisement of his *Miranda* rights.[47]

---

[45]*See id.*

[46]*See Allen*, 713 F.3d at 387-88; *Thomas*, 524 F.3d at 859, 862; *see also Almeida*, 748 F.3d at 49 (the currency found in the defendant's wallet would have inevitably been, lawful means when he was processed at the jail); 6 LaFave, *Search and Seizure*, §11.4(a) n. 162 ("where the circumstances are such that, pursuant to some standardized procedures or established routine [,] a certain evidence-revealing event would definitely have occurred later").

[47]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

### 1. Pre-Arrest Statements

It is undisputed that after Cruz alerted, Officer Iyotte searched Bordeaux and seized a checkbook with three rolls of currency in it from a pants pocket. The officer then pointedly asked if Bordeaux was employed, when his last contracting term was and how much money was in the checkbook. Bordeaux answered each of the questions.

Although Bordeaux was technically seized after his vehicle was stopped,[48] *Miranda* warnings were not required because he was not subjected to the functional equivalent of a formal arrest.[49] Before Bordeaux was handcuffed and arrested, this was nothing more than an ordinary traffic stop.[50] His detention – the time between when he was stopped and when he was questioned about his work status and the amount of cash he had on him – was of short duration, lasting a mere seven to eight minutes.[51] What's more, the questioning was in a public place, with passersby able to witness his interaction with the officers and in a substantially less "police dominated" atmosphere than that surrounding the interrogation at issue in *Miranda* and in subsequent cases in which *Miranda* has been

---

[48]*See Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984).

[49]*See id.* at 440-42; *Coleman*, 700 F.3d at 336; *United States v. Morse*, 569 F.3d 882, 884 (8th Cir. 2009); *Martin*, 411 F.3d at 1003.

[50]*See Berkemer*, 468 U.S. at 436-40; *United States v. Sepulveda-Sandoval*, 729 F.Supp.2d 1078, 1098-99 (D.S.D. 2010).

[51]*See Berkemer*, 468 U.S. at 437-38.

applied.[52] And significantly, Bordeaux was never "informed that his detention would not be temporary," and he was only asked a "modest number of questions."[53]

The fact that Bordeaux was not free to leave and may have reasonably believed that he could not terminate his encounter with the officers does not transform the situation into a full custodial arrest and mandate the giving of *Miranda* warnings as a condition precedent to eliciting statements from him.[54] In the final analysis, Bordeaux was not taken into custody, for purposes of *Miranda,* until he was arrested. This being the case, the statements he made prior to that point are admissible as substantive evidence against him.[55]

### 2. Post-Arrest Statements

Bordeaux's post-arrest statements to Special Agent Estes yield the same result. Bordeaux was informed of his rights under *Miranda* and acknowledged, in writing, that he had read and understood them. The audio recording of the interview provides proof positive of this. Bordeaux's post-arrest *Miranda* claim – premised solely on the lack of any *Miranda* advisement – has no merit whatsoever.

---

[52]*See id.* at 438-39.

[53]*Id.* at 442; *see also Morse*, 569 F.3d at 884 (*quoting Berkemer*); *Martin*, 411 F.3d at 1003 (same).

[54]*See Morse*, 569 F.3d at 884; *Sepulveda-Sandoval* , 729 F.Supp. 2d at 1098.

[55]*See Berkemer*, 468 U.S. at 442; *Coleman*, 700 F.3d at 336; *Morse*, 569 F.3d at 884; *Martin*, 411 F.3d at 1003.

### F. Jail Search and Subsequent Statements

Bordeaux lastly claims that because his traffic stop, detention and arrest and the search of the vehicle violated his Fourth Amendment rights, all evidence seized at the jail and his statements to Special Agent Estes, must be suppressed as fruit of the poisonous tree. He raises no other grounds as a basis for suppressing the evidence found at the jail, after his arrest, or for suppressing the statements, he made later on, to the agent.

Bordeaux's argument is unavailing. The stop, detention, arrest and search were all lawful and in accord with Fourth Amendment precepts. There being no poisonous tree from which any tainted fruit could fall,[56] the evidence and statements obtained from him at the jail are admissible.

### CONCLUSION

The traffic stop, detention, arrest and vehicle search all complied with the strictures of the Fourth Amendment and provide no basis for the exclusion of evidence and statements derived from them. While the legality of the $1,200 that was confiscated from Bordeaux is questionable, suppression is unnecessary because the money ultimately and inevitably would have been discovered by lawful means.

Bordeaux's pre-arrest statements were obtained during the course of a traffic stop and at a time when he was not subject to restraints comparable to those of a formal arrest. No *Miranda* warnings were therefore required and his statements may be used at trial for

---

[56]*See United States v. Hessman*, 369 F.3d 1016, 1024 (8th Cir. 2004), *cert. denied*, 543 U.S. 1072(2005).

any purpose.  So can his post-arrest statements, which the record unequivocally shows were made after a full *Miranda* advisement.

RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Bordeaux's suppression motion[57] be denied.

NOTICE

Normally, parties have fourteen calendar days after service of a report and recommendation to file written objections to the same,[58] unless an extension of time for cause is obtained.[59]  The parties in this case have agreed to shorten the objection period from fourteen to seven calendar days. The condensed period notwithstanding, both parties are reminded that the failure to file timely objections will result in the waiver of their right to appeal questions of fact.[60]  And any objections raised must "identify[ ] those issues on which further review is desired[.]"[61]

---

[57]*See* Dkt. No. 19.

[58]*See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[59]*See Thompson v. Nix,* 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black,* 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn,* 474 U.S. 140, 155 (1985)).

[60]*See Thompson,* 897 F.2d at 357; *Nash,* 781 at 667.

[61]*Arn,* 474 U.S. at 155.

Dated this 12th day of September, 2014, at Pierre, South Dakota.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE