UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR 14-30067-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | ADOPTING IN PART REPORT |
| LAWRENCE BORDEAUX, | * | AND RECOMMENDATION |
| | * | |
| Defendant. | * | |

At approximately 3:48 a.m., on March 12, 2014, Rosebud Sioux Tribal police officers Darrin Running Horse and Patrick Iyotte stopped Lawrence Bordeaux for failing to dim his vehicle's headlights when approaching oncoming traffic. T.[1] 29–30, 36. Bordeaux did not have a driver's license and the officers suspected that he was under the influence of something. T. 36–40. They deployed Officer Running Horse's drug dog Cruz, who alerted twice to Bordeaux's vehicle. T. 41–42. The officers then conducted a search, finding a suspected marijuana cigarette and a digital scale in Bordeaux's car and a checkbook containing three rolls of money in his rear pocket. T. 42–43, 79. At the Rosebud Jail, three baggies containing methamphetamine were retrieved from Bordeaux's underwear and crotch area. Ben Estes, a special agent with the Rosebud Sioux Tribal Police Department, interviewed Bordeaux at the jail that same morning. T. 88–89.

A grand jury indicted Bordeaux for conspiracy to distribute and possession with intent to distribute methamphetamine. Doc. 1. Bordeaux filed a motion to suppress his statements and all of the evidence seized from him and the vehicle, which the Government opposed. Docs. 19, 20, 24.

---

[1]Any references to the suppression hearing transcript will be "T" followed by the page number or numbers.

Magistrate Judge Mark A. Moreno held an evidentiary hearing during which he received several exhibits into evidence, including a video recording of the traffic stop, an audio recording of Agent Estes interviewing Bordeaux, and Cruz's training and certification records. Judge Moreno also heard testimony from Officer Running Horse, Officer Iyotte, Agent Estes, and Bordeaux's mother. Judge Moreno issued a Report and Recommendation recommending that Bordeaux's motion be denied. Doc. 34. Bordeaux now objects to the Report and Recommendation, arguing that the traffic stop, his detention, the search of his vehicle, and his arrest all violate the Fourth Amendment and that the evidence seized from him and his vehicle and his statements to Agent Estes must therefore be suppressed. Bordeaux also contends that certain statements he made to Officer Iyotte violate Miranda v. Arizona, 384 U.S. 436 (1966).

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Having conducted a de novo review, this Court adopts most of the Report and Recommendation, but hesitates with respect to the questioning of Bordeaux after the search and seizure of his checkbook at the traffic stop.

I.    **Traffic Stop**

Bordeaux objects to Judge Moreno's factual findings and legal conclusions that his vehicle had its high beams on and that his failure to dim the lights justified the traffic stop. He contends that the video of the stop undermines Judge Moreno's findings and that Officer Running Horse stopped him merely because he was driving in the early morning hours.

2

A traffic stop is a "seizure" under the Fourth Amendment and must be supported by probable cause or reasonable suspicion. United States v. Gordon, 741 F.3d 872, 876 (8th Cir. 2013). Probable cause for a traffic stop exists "[a]s long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law." Id. (alteration in original) (quoting United States v. Coney, 456 F.3d 850, 856 (8th Cir. 2006)) (internal quotation marks omitted). This is true even when the traffic violation is minor and the stop is simply "a pretext for other investigation." United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008). Here, Officers Running Horse and Iyotte stopped Bordeaux for violating the Rosebud Sioux Tribe Law and Order Code, which requires a driver to dim his headlights when meeting oncoming traffic. Rosebud Sioux Tribe Law and Order Code § 6-5-1 (incorporating Chapter 32-17 of the South Dakota Code into the Tribal Traffic Code); S.D. Codified Laws § 32-17-7 (requiring motorists to dim headlights in the face of oncoming traffic).

The hearing transcript and video of the stop show that the officers had an objectively reasonable basis for believing that Bordeaux violated a traffic law. Officer Running Horse testified that Bordeaux passed him going the opposite direction with his headlights on high beam. T. 29–30. Officer Running Horse explained that Bordeaux did not dim his headlights until Officer Running Horse had turned his patrol car around and begun following Bordeaux. T. 31, 34. The video of the stop corroborates Officer Running Horse's testimony. Ex. 1 at 00:00–00:30. It shows Bordeaux pass Officer Running Horse's vehicle going the opposite direction with lights that seem to be on high beam. Careful viewing of the video from when the patrol car is turned around and approaching from behind shows that Bordeaux tilted his headlights downward immediately before Officer Running Horse activated his emergency lights. Ex. 1 at 00:00–00:30.

3

Although Bordeaux hypothesizes that his headlights could have been angled upwards such that it merely appeared that his brights were on, no evidence supports this hypothesis and it conflicts with both Officer Running Horse's testimony and the video recording. Further, even if Bordeaux's headlights merely appeared to be on high, this would not deprive the officers of probable cause. The relevant question when reviewing a traffic stop is whether it was reasonable for the officer to believe that a traffic violation had been committed, not whether a traffic violation actually occurred. See United States v. Hastings, 685 F.3d 724, 727–28 (8th Cir. 2012) (explaining that it was unnecessary to determine whether the defendant had actually committed a traffic violation because it was objectively reasonable for the officer to believe that the defendant had done so). Nor, as Bordeaux argues, does it matter that the officers never issued him a citation for failing to dim his lights. When, as here, officers have an objectively reasonable basis to believe that a motorist violated a traffic law, the officers' failure to pursue the traffic violation does not undermine the legality of the stop. See United States v. Garrido, 467 F.3d 971, 978 (6th Cir. 2006) (holding that officers' decision to not issue the defendant a citation after pulling him over for following too closely did not render the stop unlawful after the fact). It is irrelevant that the officers may have ignored Bordeaux's traffic violation had they not believed he was committing a more serious crime. United States v. Frasher, 632 F.3d 450, 453 (8th Cir. 2011). Bordeaux's objections to Judge Moreno's factual findings and legal conclusions concerning the initial stop are overruled.

## II.    Detention at Scene

Bordeaux's next objections focus on his detention and the deployment of the drug dog Cruz. Judge Moreno concluded that the officers reasonably extended the stop to deploy Cruz and that the extension was only a de minimis intrusion on Bordeaux's personal liberty. He also found that

4

extending the stop to deploy Cruz was appropriate because the officers had a reasonable suspicion that Bordeaux possessed or was under the influence of drugs. Bordeaux objects to these conclusions, arguing that the dog sniff was the product of an unlawful seizure. Because Bordeaux's objection is both legal and factual, this Court briefly recounts the circumstances of the dog sniff.

According to the time stamp on the video recording, Officer Running Horse initiated the traffic stop by turning on his emergency lights at 3:48:37 a.m. Ex. 1 at 00:28. He approached the vehicle on the driver's side and informed Bordeaux of the reason for the stop. T. 35–36; Ex. 1 at 01:02. Bordeaux told Officer Running Horse that he was "going after his brother" and admitted that he did not have a driver's license. T. 36. Officer Running Horse observed that Bordeaux's eyes were red, bloodshot, and glossy, that his voice and hands appeared shaky, and that he was nervous and avoided eye contact. T. 37–38. Given these observations and his experience that the early morning hours are an "active" time for inebriated driving, Officer Running Horse suspected that Bordeaux was under the influence of alcohol. T. 38; T. 69.

Officer Running Horse returned to his patrol car for approximately two minutes to check whether Bordeaux had any arrest warrants. T. 38; Ex. 1 at 02:25–04:24. When the check came back clear, Officer Running Horse told Bordeaux to exit his vehicle. T. 39. Bordeaux complied, and was asked whether he had been drinking. T. 39. When he said no, Officer Running Horse asked Bordeaux to take a portable breath test and Bordeaux agreed. T. 39. Officer Iyotte administered the test, which showed that Bordeaux had not been drinking. T. 39–40; Ex. 1. The test results caused Officer Running Horse to suspect that Bordeaux might instead be under the influence of drugs. T. 69; see also T. 64–65. Officer Running Horse deployed Cruz almost immediately after the test was

completed. T. 40; Ex. 1 at 04:40–05:43. The dog sniff was concluded within forty-five seconds.

Ex. 1 at 05:00–05:43. Cruz alerted to the driver's side window twice. T. 42.[2]

Bordeaux's position on Judge Moreno's first conclusion—that the extension of the traffic stop

to deploy Cruz was a de minimis intrusion on Bordeaux's personal liberty—is somewhat confusing.

The Fourth Amendment protects against unreasonable seizures. The Eighth Circuit has explained

that "when a dog sniff occurs after a very short lapse of time from when the purpose of the traffic

stop has been completed, there is a de minimis intrusion, and therefore, under the general rule of

reasonableness, the stop does not violate the Fourth Amendment." United States v. Mohamed, 600

F.3d 1000, 1005 (8th Cir. 2010); see also, e.g., United States v. Alexander, 448 F.3d 1014, 1016 (8th

Cir. 2006) ("[D]og sniffs that occur within a short time following the completion of a traffic stop are

not constitutionally prohibited if they constitute only *de minimis* intrusions on the defendant's Fourth

Amendment rights."). Rather than address this line of Eighth Circuit authority, Bordeaux argues that

the officers did not have reasonable suspicion to believe that criminal activity was afoot. Doc. 36

at 3–5. Bordeaux's argument misses the mark, however, as the Eighth Circuit cases finding that a

dog sniff was a de minimis intrusion do not turn on the presence of reasonable suspicion. Mohamed,

600 F.3d at 1005; Alexander, 448 F.3d at 1016. Instead, these cases focus on whether the traffic stop

was "unreasonably prolonged before" the dog sniff. Alexander, 448 F.3d at 1016. The Eighth

Circuit has consistently held that a traffic stop is not unreasonably prolonged when an officer

---

[2]In the "Background" section of the Report and Recommendation, Judge Moreno incorrectly stated that "Bordeaux then went back and showed Cruz the window area again and Cruz alerted by freezing a second time." Doc. 34 at 3. Although Bordeaux objects to this error, it is inconsequential; the remainder of the Report and Recommendation makes clear that Judge Moreno did not believe that Bordeaux showed Cruz the vehicle, but simply mistakenly substituted "Bordeaux" for "Running Horse."

conducts a dog sniff within minutes of concluding the stop. See United States v. Rodriguez, 741 F.3d 905, 907–08 (8th Cir. 2014) (finding that seven to eight minute delay was not unreasonable) cert. granted, 135 S. Ct. 43 (2014); Alexander, 448 F.3d at 1017 (upholding four-minute delay as a de minimis intrusion on defendant's liberty); United States v. Martin, 411 F.3d 998, 1002 (8th Cir. 2005) (finding that two-minute delay did not violate the Fourth Amendment); United States v. Morgan, 270 F.3d 625, 631–32 (8th Cir. 2001) (upholding delay of "well under ten minutes"); United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 649 (8th Cir. 1999) (upholding two-minute delay).

Here, approximately five minutes and fifteen seconds passed between the time Officer Running Horse initiated the traffic stop at 3:48:37 a.m. and the time he completed the dog sniff at 3:53:52 a.m. Ex. 1 at 00:28–05:43. It took just under four minutes for the officers to inform Bordeaux of the reason for the stop, ask him routine questions, and run a records check. T. 36–39; Ex. 1 at 00:28–04:22. Bordeaux's detention during this time was entirely reasonable. See United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (explaining that officers may extend a stop to allow them "to ask about the motorist's destination and purpose, to check the validity of the driver's license and registration, and to check the driver's criminal history for outstanding warrants"). The remaining one minute and twenty-some seconds during which the officers gave Bordeaux the breathalyzer test and completed the dog sniff was a de minimis intrusion on Bordeaux's personal liberty and did not unreasonably prolong the stop. See Rodriguez, 741 F.3d at 907–08; Alexander, 448 F.3d at 1017; Martin, 411 F.3d at 1002; Morgan, 270 F.3d at 631–32; $404,905.00 in U.S. Currency, 182 F.3d at 649.

7

Even if Bordeaux were right that there was more than a de minimis intrusion on his personal liberty, Bordeaux would still not be entitled to suppression of the evidence seized from his person and vehicle.  An officer may expand the scope of a traffic stop if he has reasonable suspicion that other criminal activity is in progress.  United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008). "To be reasonable, suspicion must be based on 'specific and articulable facts' that are 'taken together with rational inferences from those facts'—that is, something more than an 'inchoate and unparticularized suspicion or hunch.'"  United States v. Stewart, 631 F.3d 453, 457 (8th Cir. 2011) (quoting Terry v. Ohio, 392 U.S. 1, 21, 29 (1968)) (internal quotation marks omitted).  Whether reasonable suspicion exists "is determined by looking at the totality of the circumstances, in light of the officer's experience."  United States v. Bracamontes, 614 F.3d 813, 816 (8th Cir. 2010) (quoting United States v. Shafer, 608 F.3d 1056, 1062 (8th Cir. 2010)).

Under the totality of the circumstances, the early morning hour of the stop and the officers' observations of Bordeaux provided reasonable suspicion that he was driving under the influence of alcohol.  When the officers made contact with Bordeaux it was approximately 3:48 a.m.  Ex. 1.  In Officer Running Horse's experience, this was an "active" time for impaired drivers to be on the road. T. 38; see also T. 69.  Bordeaux's eyes were red, bloodshot, and glossy.  T. 37; 81.  His voice and hands were shaky and he was nervous and avoided eye contact.  T. 38.  Unlike Officer Running Horse's experience with motorists who were simply nervous to be stopped by a police officer, Bordeaux's nervousness did not subside as the stop progressed.  T. 65.  Once the breathalyzer test showed that Bordeaux had not been drinking, the officers reasonably extended the stop to determine whether Bordeaux's use of drugs might provide an explanation for the suspicious circumstances.  See United States v. Neeman, No. 99-3666, 2000 WL 489581, at *1 (8th Cir. Apr. 26, 2000)

8

(unpublished table decision) (per curiam) (finding that officers were justified in expanding stop to find an alternate explanation for suspicious situation despite the defendant passing field sobriety tests where the officers found the defendant asleep in a running car that was parked askew and the defendant's eyes were red and watery).

Bordeaux offers several reasons why the officers did not have reasonable suspicion, focusing first on Officer Running Horse's credibility. Bordeaux questions Officer Running Horse's ability to observe that his eyes were red, bloodshot, and glossy when Officer Running Horse also testified that it was dark inside Bordeaux's vehicle and that Bordeaux avoided eye contact. Officer Running Horse specifically testified, however, that he was still able to see Bordeaux's eyes from the side despite Bordeaux avoiding eye contact. T. 52. Further, Officer Iyotte testified that he observed Bordeaux's red, bloodshot eyes when Bordeaux approached him, T. 81, and Bordeaux does not argue that this testimony is unreliable. As for Bordeaux's claim that the vehicle was too dark for Officer Running Horse to observe his eyes, the video shows that Officer Running Horse shined a flashlight into Bordeaux's car when speaking with him. Ex. 1 at 01:00–02:20. Bordeaux also notes that Officer Running Horse failed to mention in his police report that Bordeaux's voice was shaky and that he was nervous. This might be concerning had Officer Running Horse's report made no mention of Bordeaux exhibiting some type of nervous behavior, but that is not the case. Officer Running Horse included in his report that Bordeaux's hands appeared shaky. T. 52. The discrepancy between Officer Running Horse's police report and his later testimony under oath is not significant enough to render him untrustworthy. Cf. United States v. Mendoza, 677 F.3d 822, 827–28 (8th Cir. 2012) (holding that officer's failure to include certain details in report was insufficient to "render the officer's testimony concerning the underlying action facially implausible"). Furthermore, Judge

Moreno, who witnessed Officer Running Horse testify, evidently found Officer Running Horse credible. After reviewing the hearing transcript and giving appropriate consideration to Judge Moreno's opportunity to observe Officer Running Horse when testifying, this Court deems Officer Running Horse's testimony credible and rejects Bordeaux's assertions to the contrary.

Bordeaux argues next that there are innocent explanations for some of the officers' observations, including that his eyes may have been red, bloodshot, and glossy because he had just woken up and that being stopped by the police could make anyone nervous. Indeed, the Eighth Circuit has stated that "[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." United States v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998). However, Officer Running Horse testified that Bordeaux's nervous behavior was unlike the behavior he had observed in people who were simply nervous to be stopped by a police officer. T. 65. Further, Bordeaux's ability to put an innocent spin on some of the officers' observations does not render the officers' suspicion unreasonable. After all, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." United States v. Arvizu, 534 U.S. 266, 277 (2002). Accordingly, "factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." Stewart, 631 F.3d at 457.

Finally, Bordeaux argues that the lack of certain evidence dispelled any reasonable suspicion the officers may have had that he was driving while intoxicated. Bordeaux points to Officer Running Horse's testimony that he did not detect an odor of alcohol or marijuana emanating from Bordeaux, that Bordeaux did not commit any traffic violations beyond failing to dim his headlights, and that there was nothing unusual about the way Bordeaux walked. Although Bordeaux is correct that he

10

did not possess every characteristic that a person who is driving under the influence of alcohol or drugs may exhibit, this does not mean that the officers could not draw a rational inference from other facts to give rise to reasonable suspicion that Bordeaux was under the influence of drugs or alcohol. See United States v. Black, 240 F. App'x 95, 100–01 (6th Cir. 2007) (holding that although the officer did not observe the defendant slur his speech, stumble, or have bloodshot eyes, none of these factors negated that the officer smelled alcohol and observed other facts that provided reasonable suspicion).

In sum, the specific, articulable facts set forth above and the rational inferences drawn from them provided the officers with reasonable suspicion to believe that Bordeaux was under the influence of drugs. This reasonable suspicion justified expanding the stop to deploy Cruz. See Hogan, 539 F.3d at 921 (explaining that officer's reasonable suspicion that motorist was under the influence of drugs allowed officer to extend the stop to involve a drug dog). The dog sniff verified the officers' suspicions within forty-five seconds and did not unduly prolong Bordeaux's detention. See Michigan v. Summers, 452 U.S. 692, 701 n.14 (1981) ("[T]he reasonableness of a detention may be determined in part by 'whether the police are diligently pursuing a means of investigation which is likely to resolve the matter one way or another very soon . . . .'") (quoting 3 Wayne R. Lafave, Search and Seizure § 9.2 (1978))). Bordeaux's objections concerning the detention and deployment of Cruz are overruled.

**III.    Cruz's Reliability**

Bordeaux objects to Judge Moreno's conclusion that Cruz's training, certifications, and history and experience established the dog's reliability. He argues that the amount of monthly

training Cruz received, when coupled with the fact that Cruz's certification was due to expire one month after the traffic stop, casts significant doubt on Cruz's drug-detection abilities.

"[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for . . . the search of a vehicle." United States v. Winters, 600 F.3d 963, 967 (8th Cir. 2010) (collecting cases); see also Florida v. Harris, 133 S. Ct. 1050, 1057 n.2 (2013) ("[A] well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found.").[3] When, as here, a defendant argues that a drug dog is too unreliable to provide officers with probable cause, the relevant inquiry "is whether all the facts

---

[3]The Eighth Circuit has noted a distinction between a dog's "alert" and "indication." See United States v. Salgado, 761 F.3d 861, 864 (8th Cir. 2014) (recounting officer's testimony that "an 'alert' is a change in the dog's breathing pattern, while an 'indication' is a more concrete signal that the dog has detected a particular odor"); United States v. Holleman, 743 F.3d 1152, 1156 n.3 (8th Cir.) (stating that an "'alert' occurs when a dog detects the odor of the drugs he is trained to locate" while an "'indication' occurs when a dog identifies the location of the strongest source of the drug odor"), cert. denied, 134 S. Ct. 2890 (2014); see also Harris, 133 S. Ct. at 1054 (stating that a dog's alert to a vehicle signaled, "through a distinctive set of behaviors, that he smelled drugs there"). Some Eighth Circuit cases, such as Winters, suggest that an alert alone is sufficient to establish probable cause. United States v. Carbajal, 449 F. App'x 551, 554 (8th Cir. 2012) (per curiam) ("[T]he 'alert or indication by a properly trained and reliable drug dog' is itself sufficient to provide probable cause for the search of a vehicle . . . ." (quoting Winters, 600 F.3d at 967)); Hogan, 539 F.3d at 921 ("When the dog alerted, the officers had probable cause to search the vehicle."). The Eighth Circuit's opinion in Holleman, however, suggests that whether a dog's alert is sufficient to establish probable cause is an open question. 743 F.3d at 1156–57. The record here is not entirely clear concerning whether Cruz alerted or indicated to Bordeaux's vehicle. The Government used "alert" and "indication" interchangeably when questioning Officer Running Horse, T. 41–42, and Officer Running Horse never differentiated between the two terms. When asked how Cruz "tell[s] or "signal[s]" Officer Running Horse that he has "detected the odor of a narcotic," Officer Running Horse testified that Cruz's "behavior definitely changes, his breathing changes. He stops, he either sits or freezes and stays in that position." T. 41. The video of the stop shows that Cruz stopped and froze at the driver's side window twice. Ex. 1 at 05:00–05:45; see also T. 42. Even assuming that Cruz's actions were mere "alerts," this Court, as explained more fully below, would still conclude that the officers had probable cause to search Bordeaux's vehicle under the totality of the circumstances. See Holleman, 743 F.3d at 1156–58 (holding that drug dog's two alerts to vehicle, when considered together with other suspicious circumstances, provided probable cause to search vehicle).

surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." Harris, 133 S. Ct. at 1058.

This Court agrees with Judge Moreno's conclusion that Cruz is reliable. Less than eleven months before the traffic stop, Officer Running Horse and Cruz successfully completed a program in narcotics detection and obtained a certification from an independent canine training company. T. 20–23; Ex. 2; Ex. 2A. Although "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert," Harris, 133 S. Ct. at 1057, there is additional evidence that Cruz is trustworthy. Following the 2013 certification, Officer Running Horse did monthly training exercises with Cruz to ensure that Cruz remained reliable. T. 25–29. The records from this training show that Cruz always found hidden drugs and that he did not have any false positives. Ex. 7. Officer Running Horse testified that there was nothing during this training that caused him to doubt Cruz's reliability. T. 29. Finally, Cruz's experience as a police dog dates back to 2010, when he underwent a five-week training course and began working with the Rosebud Sioux Tribe Police Department. T. 20; United States v. Valandra, No. CR. 11-30010-RAL, 2011 WL 3439930, at *5–6 (D.S.D. June 9, 2011), adopted by 2011 WL 3439919 (D.S.D. Aug. 5, 2011). This Court is familiar with Cruz from other cases, and has previously found him reliable. Valandra, 2011 WL 3439930, at *5–6 (finding Cruz reliable in light of his certification and accuracy rate which, from May 2010 through August 2010, was 100% in training and between 71.4% and 78.6% in the field).

Cruz's current certification and exemplary training records establish that Cruz did not, as Bordeaux argues, need even more training before Officer Running Horse could consider Cruz

reliable. Cruz's two alerts to Bordeaux's vehicle, when coupled with the factors providing the officers with reasonable suspicion that Bordeaux was under the influence of drugs, gave the officers probable cause to search Bordeaux's vehicle. Bordeaux's objections concerning Cruz's reliability are overruled.

**IV.    Money Seized and Statements**

After Cruz alerted, Officer Running Horse returned Cruz to the patrol car and informed Bordeaux that the officers were going to search his vehicle. T. 42–43, 72. Officer Iyotte then instructed Bordeaux to place his hands on the patrol car and began searching him. T. 72–73, 79. The search revealed a checkbook in Bordeaux's rear pocket. T. 72–73. Officer Iyotte opened the checkbook and discovered three rolls of money in it. T. 73, 79. He asked Bordeaux whether he was employed and when he had last worked. T. 73, 80. Bordeaux said that he was not employed but that he had done some part-time contracting work approximately two weeks ago. T. 73, 80. Officer Iyotte then asked how much money was in the checkbook and Bordeaux told him there was approximately $1,200 that he was saving for his daughter's birthday. T. 80. The officers placed Bordeaux in the back of the patrol car and searched his vehicle. T. 43, 74. After locating a suspected marijuana cigarette and a digital scale, T. 43, the officers informed Bordeaux that he was under arrest for possession of marijuana, T. 47–48, 84.

At the suppression hearing, the Government characterized Officer Iyotte's search of Bordeaux as a "weapon search"[4] and conceded that Officer Iyotte should not have opened the checkbook. T. 109; Doc. 24 at 13; see also Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (explaining that a

---

[4]Officer Running Horse also characterized Officer Iyotte's search of Bordeaux as a weapon search. T. 55. Curiously, Officer Iyotte characterized it as a "probable cause search." T. 72, 82–83.

14

protective search "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby'" (quoting Terry, 392 U.S. at 26)). The Government argued, however, that the money was admissible under the inevitable discovery doctrine. See Nix v. Williams, 467 U.S. 431 (1984). Judge Moreno agreed, recommending that Bordeaux's motion to suppress the money be denied because it would have inevitably been discovered during the booking process after Bordeaux was arrested. Judge Moreno also concluded that Bordeaux's statements to Officer Iyotte about the money are admissible because Bordeaux was not in custody for purposes of Miranda at the time he gave them. Bordeaux objects to both of Judge Moreno's conclusions.

With respect to the money, Bordeaux argues that the inevitable discovery doctrine is inapplicable because the stop, detention to deploy Cruz, and search of his car were all illegal, and the police therefore would not have discovered the cash by lawful means. Because the stop, detention, and vehicle search did not violate the Fourth Amendment, Bordeaux's objection concerning the money is overruled.

With regard to Bordeaux's statements about the money, Judge Moreno found Berkemer v. McCarty, 468 U.S. 420 (1984) controlling. Berkemer involved the roadside questioning of a motorist who was detained during a traffic stop. Id. at 423. The Supreme Court in Berkemer held that due to the "noncoercive" nature of ordinary traffic stops, "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." Berkemer, 468 U.S. at 440. The Court identified two characteristics of an ordinary traffic stop that make it unlikely that motorists will be coerced into incriminating themselves. Id. at 437–440. First, unlike a stationhouse interrogation where a detainee knows that questioning likely will continue until he provides

15

sufficient answers, traffic stops are "presumptively temporary and brief." Id. at 437–38. Second, traffic stops typically occur in public rather than in a police-dominated atmosphere, thereby reducing the chances that police officers may use unlawful tactics to extract incriminating statements and diminishing "the motorist's fear that, if he does not cooperate, he will be subjected to abuse." Id. at 438–39. The Court in Berkemer ultimately concluded that the motorist was not entitled to Miranda warnings because he had not been subjected to "the functional equivalent of formal arrest." Id. at 442. In reaching this conclusion, the Court emphasized that the time between the stop and the arrest was brief, that the motorist was never informed "that his detention would not be temporary," and that a single officer asked the motorist a "modest number of questions" at a place visible to other motorists. Id. at 441–42.

Whether Bordeaux was subject to "the functional equivalent of formal arrest" at the time Officer Iyotte questioned him is a very close question. On the one hand, this Court agrees with Judge Moreno that several of the noncoercive aspects of the traffic stop in Berkemer are present here, including that the encounter between Officer Iyotte and Bordeaux took place on the roadside in view of passing motorists, T. 79; Ex. 1; that Officer Running Horse only asked Bordeaux three questions about the money, T. 80–81; that Bordeaux was not handcuffed at the time, T. 82; and that the time between the initial stop and when Officer Iyotte had finished questioning Bordeaux was short, totaling less than eight-and-a-half minutes, Ex. 1 at 00:28–08:30. On the other hand, there are factors that distinguish this stop from the "ordinary traffic stop" at issue in Berkemer. Before Officer Iyotte questioned Bordeaux about the money, the officers had ordered Bordeaux out of his vehicle and told him to place his hands on the patrol car, T. 39, 79; Officer Running Horse had informed Bordeaux of Cruz's alert and told Bordeaux that they were going to search his car, T. 42–43; and

16

Officer Iyotte had discovered the three rolls of money in Bordeaux's checkbook, T. 73, 80. Moreover, Officer Iyotte himself characterized the search of Bordeaux's person not as a weapons search but as a "probable cause search," T. 72, 82–83, suggesting a custody setting. The Supreme Court in Berkemer recognized that a traffic stop may become custodial under certain circumstances. 468 U.S. at 440 ("If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda."). At least one court has determined that facts similar to those present here constituted a custodial interrogation. See United States v. Richardson, 700 F. Supp. 2d 1040, 1052–1053 (N.D. Ind. 2010), aff'd, 657 F.3d 521 (7th Cir. 2011). The court in Richardson found that a motorist was entitled to Miranda warnings before being questioned about drugs an officer discovered on him during a pat-down search. Id. Critical to the court's holding was that by the time the officer discovered the drugs, he had ordered the motorist out of his vehicle, informed him that a drug dog had alerted to his vehicle, and told him that the vehicle would be searched. Id.; see also United States v. Carter, 884 F.2d 368, 372 (8th Cir. 1989) (finding fact that defendant was "confronted with damning evidence of guilt" relevant to custody determination).

Beyond the custody issue, there is a question whether Bordeaux's statements about the money fall within the inevitable discovery doctrine. Officer Iyotte, by the Government's own admission, violated the Fourth Amendment when he removed Bordeaux's checkbook and opened it. See Dickerson, 508 U.S. at 378–79. There was nothing inherently incriminating about the checkbook and Officer Iyotte testified that he knew the checkbook was not a weapon and only opened it because he was curious about what was inside. T. 73. Because Officer Iyotte's search exceeded its lawful scope, the fruits of this search must be suppressed unless there is an exception to the exclusionary

17

rule. <u>Dickerson</u>, 508 U.S. at 373 ("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under <u>Terry</u> and its fruits will be suppressed."). As noted above, Judge Moreno concluded that the money would have been discovered during the booking process and was therefore admissible under the inevitable discovery doctrine. This doctrine provides that evidence discovered in violation of the Fourth Amendment need not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." <u>Nix</u>, 467 U.S. at 444. The Government has yet to offer any evidence that, had the money been discovered at the jail, Bordeaux, in custody at that time and presumably advised of his <u>Miranda</u> rights, would have made the same statements he made while being detained on the roadside. Indeed, the Government did not even make this argument. This Court thus cannot conclude that the Government has met its burden to show that Bordeaux's statements inevitably would have been discovered.

Yet Bordeaux's attempt to suppress his statements about the money is curious. Although this Court is unaware of all the facts surrounding Bordeaux's alleged offense, the statements in question appear to be exculpatory. As such, it is unclear whether the Government would even seek to introduce these statements at trial. Given the significant questions concerning whether Bordeaux's statements are admissible, this Court plans to suppress those statements but reserves final ruling on this issue until the pretrial conference.

## V.    Jail Search and Subsequent Statements

Bordeaux argued unsuccessfully to Judge Moreno that because the traffic stop, detention, arrest, and search of his car and person were all illegal, the evidence seized from him at the jail and

his post-arrest statements must be suppressed as fruit of the poisonous tree.  See Wong Sun v. United States, 371 U.S. 471 (1963).  Bordeaux now objects to Judge Moreno's recommendation to the contrary.  Because the stop, detention, arrest, and search were all legal, Bordeaux's objection is overruled.[5]

## VI.    Conclusion

For the foregoing reasons, it is hereby

ORDERED that Bordeaux's Motion to Suppress Statements and Evidence, Doc. 19, is denied except to the extent it seeks to suppress Bordeaux's statements to Officer Iyotte about the money found in the checkbook.  The Court plans to suppress those statements, but reserves final ruling on this issue until the pretrial conference.  It is further

ORDERED that the Report and Recommendation, Doc. 34, is otherwise adopted.

Dated November 17, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

---

[5]Bordeaux argued in his initial motion to suppress that his statements to Agent Estes violated Miranda, Doc. 20 at 6, but he has since withdrawn this portion of his motion, T. 96; Doc. 36 at 8.